UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 5: 19-069-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| WALTER EUGENE POWELL, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

A federal grand jury indicted Defendants Walter Powell and Elisha Wilson for various controlled substance offenses on April 4, 2019.[1]  A jury trial is scheduled to begin September 17, 2019.  Defendant Powell has filed a motion to dismiss the charges pending against him, arguing that the government failed to preserve potentially exculpatory evidence in violation of *Arizona v. Youngblood*, 488 U.S. 51 (1988).  [Record No. 73]  The motion will be denied.  As explained more fully below, Powell has failed to demonstrate that the government acted in bad faith with respect to subject evidence.

## I.

Lexington Police Officers Johnson and Hogan were dispatched to the Microtel Inn in Lexington, Kentucky, on January 25, 2019.  [Record No. 41, p. 7]  Microtel employee Eugene Zita had called police for assistance evicting a guest following complaints of marijuana smoke emanating from Room 122. The room was rented in the name of Walter Powell.  Officers

---

[1] The grand jury returned a superseding indictment on May 23, 2019.  A second superseding indictment was returned on August 1, 2019.

Johnson and Hogan knocked upon arriving at Room 122 but there was no answer. The officers then advised Zita that there was no response. The three returned to Room 122 where Zita unlocked the door with a master key. *Id.* at p. 10. After officers performed a protective sweep of the room, Zita entered and began removing the occupants' belongings. Zita opened the room's refrigerator and observed a suspicious looking bag, which she removed from the refrigerator and handed to Officer Hogan. *Id.* at p. 59. The bag ultimately was determined to contain fentanyl and cocaine base. *Id.* at p. 15.

Officer Johnson subsequently obtained a search warrant for Room 122 and the vehicle parked outside which was registered to Powell. *Id.* at p. 34. Defendants Powell and Wilson eventually returned to the Microtel and were arrested. Officer Johnson testified that Wilson discarded crack cocaine in the police cruiser, and an additional quantity of fentanyl was discovered on Powell's person after he arrived at the jail. *Id.* at p. 15.

Powell has provided a copy of a hotel folio indicating that he reserved a room at the Microtel for three nights beginning on Wednesday, January 23, 2019. [Record No. 73-2] According to the folio, Powell was assigned Room 221 on January 23, 2019; however, he moved to Room 110 the following day. For reasons that are presently unclear, he moved back to Room 122 for the final night (January 25, 2019).

Microtel has video cameras in the hallways leading to guest rooms. "At some point early in the discovery process," Officer Johnson asked Microtel to provide the security footage from January 24 and 25, 2019. [Record No. 77, p. 2] Johnson visited the Microtel four times in an attempt to obtain the footage, and provided Microtel with a blank flash drive upon which to save it. *Id.* Microtel provided the government with surveillance footage and the government

disclosed that footage to Powell on May 6, 2019. However, when the parties viewed the video, they learned that Microtel had only provided footage from January 24, 2019.

On May 21, 2019, Defendant Powell filed a motion to suppress the evidence seized from Room 122. The following day, and in response to Defendant Powell's motion to suppress, DEA Task Force Officer Tim Graul visited Microtel to serve a subpoena on Eugene Zita. *Id.* at p. 3. During this visit, Graul again asked for a copy of the surveillance footage from January 25, 2019. Microtel was able to display the footage on a computer monitor, but had no way to copy or otherwise transfer it to Graul. Microtel advised that it would provide the footage once its off-site technology provider retrieved it.

The United States reports that, at the time of Graul's May 22 visit to Microtel, there was a lack of direct evidence demonstrating that Defendant Wilson had stayed in Room 122 prior to his arrest. Accordingly, Graul reviewed part of the surveillance video "to capture a segment of the footage revealing that [Wilson] stayed in the room the night before the arrest." *Id.* Graul used his phone to record Microtel's computer monitor as it played surveillance video of Powell and Wilson going into Room 122. This footage was provided to the defendants in discovery.

When the United States still had not received the entire video by July 1, 2019, TFO Graul served a subpoena on Microtel for the footage of January 24 and 25, 2019. After service of the subpoena, a Microtel employee called Graul and informed him that she was having trouble downloading the footage. Graul returned to Microtel in an effort to download the footage but discovered that Microtel had recorded over it.

Powell contends (and the government does not dispute) that the video footage from January 24, 2019, shows Room 110 unattended with the door open during housekeeping, from

10:19 a.m. until 12:11 p.m. [Record No. 73, p. 4] He suggests that the same process was likely employed for Room 122 the following day, and that "an unlimited number of persons may have had access to Room 122 on the day of the arrest." He argues that, by not having access to the deleted video, he was denied access to information showing "any and all persons who entered or left the motel room in which the drugs were found, potentially who they were and what their activities were about, and whether those persons and their activities might lead to defenses which [Powell] could assert at trial." *Id.*

## II.

The suppression of exculpatory evidence violates the defendant's due process rights regardless of "the good faith or bad faith of the prosecution." *Youngblood*, 488 U.S. at 55 (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). However, a lower standard applies when the evidence at issue is only *potentially* exculpatory. *Id.* at 57-58; *United States v. Farmer*, 289 F. App'x 81, 86 (6th Cir, 2008). When the government loses "potentially useful evidence," the defendant must show bad faith on the part of the police to establish a due process violation. *Youngblood*, 488 U.S. at 58.

Defendant Powell concedes that the video surveillance footage from January 25, 2019, is only "potentially useful." [Record No. 73, p. 5] When the government fails to preserve evidence "whose exculpatory value is indeterminate and only potentially useful," the defendant must show that

> (1) the government acted in bad faith in failing to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means.

- 4 -

*United States v. Collins*, 799 F.3d 554 (6th Cir. 2015). To demonstrate bad faith, the defendant must "prove official animus or a conscious effort to suppress exculpatory evidence." *Id.* Powell has not shown that any of these circumstances occurred in the present case.

While police officers have a duty to preserve "evidence that might be expected to play a significant role in the suspect's defense," they do not have an unlimited duty to *collect* evidence. *California v. Trombetta*, 467 U.S. 479, 488 (1984). *See also Moldowan v. City of Warren*, 578 F.3d 351, 385 (6th Cir. 2009) (police do not have an absolute duty to retain and preserve all material that might be of conceivable evidentiary significance in a particular prosecution). Instead, the defendant must provide evidence demonstrating that the officers' failure to obtain evidence was improperly motivated or that officers made a conscious effort to suppress potentially exculpatory evidence. *Collins*, 799 F.3d at 569.

Powell relies on *United States v. Bohl*, 25 F.3d 904 (10th Cir. 1994), which the Sixth Circuit cited in *United States v. Turner*, 287 F. App'x 426, 432-33 (6th Cir. 2008). In *Bohl*, the defendants' company built radar and radio transmission towers for the Federal Aviation Administration ("FAA"). After a tower leg fractured in October 1988, the FAA came to believe that the defendants had used nonconforming steel in the fabrication of the towers. The FAA discussed its concerns with the defendants, who then requested access to the towers to conduct an inspection of the steel. The FAA did not respond to the request.

Following its own inspection of the towers (which confirmed that nonconforming materials had been used), the FAA awarded a contract for the towers' removal and disposal. In the meantime, a criminal investigation began and the defendants were eventually charged with mail fraud and defrauding the United States. *Id.* at 908. The defendants renewed their request for access to the towers following indictment, but the request still went unanswered.

*Id.* 908.  The towers ultimately were razed and the defendants only received an 18-inch portion from one tower and shavings extracted from two others.  *Id.*

The defendants moved to dismiss the indictment, arguing that the government's destruction of the towers deprived them the opportunity to conduct their own examination of the towers' chemical composition.  The district court denied the motions to dismiss, as well as the defendants' subsequent motions for judgment of acquittal, reasoning that there was no evidence of governmental intent to destroy the towers.  *Id.* at 909.

The Tenth Circuit concluded that the government had acted in bad faith, and reversed and remanded for dismissal of the indictment.  Its reasons for doing so, which the defendant relies upon here, do not support a finding of bad faith in this case.  First, the *Bohl* defendants explicitly asked the government to retain the towers, but the government ignored the request and destroyed them.  This scenario is dissimilar to the present case.  Here, the government never possessed the January 25, 2019 footage and did not play a role in its destruction.  Second, the *Bohl* defendants' assertion that the materials possessed potentially exculpatory value was backed up with objective, independent evidence.  *Id.* at 911.  In this case, the defendant simply maintains that his room probably was left open and unattended because another room had been left open and unattended the previous day.  The video footage from January 25, 2019, is not necessary for Powell to present this argument to the jury.

Likewise, the third factor does not support dismissal.  In *Bohl*, the government still had possession or the ability to control the disposition of the towers when it received notice of the potentially exculpatory value.  In the present case, the government never had possession or the ability to control the January 25, 2019 surveillance footage.  Additionally, there is no suggestion that, when TFO Graul recorded the snippets of video, the government had viewed

the January 24, 2019 footage that showed rooms being left unattended. Simply put, the defendant has not established that the government had reason to believe that these videos potentially contained any exculpatory information.

The court in *Bohl* also noted that the evidence disposed of was central to the government's case against the defendants. But this is not the situation here. Instead, the government relies on other evidence including the drugs and hundreds of pieces of red construction paper cut into bindle size wrappings seized from the hotel room. The government plans to introduce evidence that, after Powell's arrest, the intake officer located 15 red-paper bindles of heroin in the defendant's underwear which were identical to the red-paper bindles located in Room 122. The government also has presented a note that Powell wrote after being taken into custody, stating that Wilson "had no knowledge of what was going on." [Record No. 77-4]

Finally, unlike *Bohl*, the government has provided an innocent explanation for its failure to obtain the material. It is clear that the officers made reasonable efforts to obtain the full surveillance video for the relevant time period. The defendant does not dispute that Officer Johnson requested the security footage early on in the discovery process. [Record No. 73, p. 2] The government disclosed the recordings to the defendant on May 6, 2019, but there is nothing to suggest that any government agent had viewed the footage and was aware that it did not include surveillance video from January 25, 2019.

After the government learned that the footage in question was missing, TFO Graul asked Microtel to provide it. And when the United States still had not received the entire video by July 1, 2019, it issued a subpoena for the footage but was informed Microtel had recorded over it. There is nothing to suggest that the government knew or should have known that

Microtel would record over the footage, since a Microtel employee informed TFO Graul on May 22, 2019, that Microtel would provide the footage after working with its off-site technology provider.

In short, the officers made diligent efforts to obtain all of the surveillance footage but were prevented from doing so when the third-party owner of the footage failed to provide it and then recorded over it. The government has explained TFO Graul's reason for recording brief portions of the surveillance footage showing Powell and Wilson going into Room 122. Contrary to the defendant's suggestion, Graul's failure to view and/or record the entire video does not demonstrate or even imply bad faith.

Finally, as the government points out, Powell had equal access to the surveillance footage. [Record No. 77, p. 8] The defendant notes that "[s]ecurity videos at merchant establishments are one of the most common items on menus of criminal discovery. Police and prosecutors collect and use them all the time, *as do defense attorneys*." [Record No. 73, p. 8] The defendant has not explained why he did not or could not have obtained the footage himself once he learned that the government had not been provided the video surveillance from January 25, 2019.

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** that Defendant Powell's motion to dismiss [Record No. 73] is **DENIED**.

Dated: August 23, 2019.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky